**C.S. McCROSSAN CONSTRUCTION, INC., Plaintiff,**

v.

**MINNESOTA DEPARTMENT OF TRANSPORTATION and Charles Zelle, Commissioner of the Minnesota Department of Transportation, Defendants,**

and

**Ames/Lunda Joint Venture, Intervenor Defendant.**

**Civ. No. 13–923 (RHK/JSM).**

United States District Court, D. Minnesota.

May 6, 2013.

Robert J. Huber, Elizabeth C. Kramer, Benjamin D. Eastburn, Leonard, Street and Deinard, P.A., Minneapolis, MN, for Plaintiff.

Erik M. Johnson, Stephen D. Melchionne, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants Minnesota Department of Transportation and Charles Zelle.

David D. Hammargren, Thomas J. Vollbrecht, Patrick J. Lee–O'Halloran, Hammargren & Meyer, P.A., Bloomington, MN, for Intervenor Defendant Ames/Lunda Joint Venture.

## MEMORANDUM OPINION AND ORDER

RICHARD H. KYLE, District Judge.

### INTRODUCTION

This action arises out of Minnesota State Project No. 8214–114 (the "Project") for the design and construction of the "approach" (described in more detail below) to the future bridge connecting Oak Park Heights, Minnesota, to St. Joseph, Wiscon-

sin, over the St. Croix River.[1] Plaintiff C.S. McCrossan Construction, Inc. ("McCrossan") submitted a proposal to the Minnesota Department of Transportation ("MNDOT") to undertake the Project for approximately $52 million. MNDOT rejected the proposal and selected a different contractor, a joint venture between Ames Construction, Inc. and Lunda Construction Company ("Ames/Lunda"), because McCrossan did not make good-faith efforts to meet MNDOT's goal for participation by disadvantaged business enterprises ("DBEs")[2] as subcontractors on the Project. McCrossan then filed the instant action, asserting that MNDOT had violated federal law and its constitutional rights by rejecting its proposal and selecting Ames/Lunda. Presently before the Court is McCrossan's Motion for a Temporary Restraining Order or Preliminary Injunction (Doc. No. 6), seeking an order enjoining performance of the contract pending resolution of its claims. For the reasons that follow, its Motion will be denied.[3]

## BACKGROUND

### I. The legal and regulatory framework

Congress has established a national goal that at least ten percent of federal highway funds be spent with DBEs. *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97–424, § 105(f), 96 Stat. 2097, 2100 (1983); Transportation Equity Act for the 21st Century, Pub. L. No. 105–178, § 1101(b)(1), 112 Stat. 107, 113 (1998). This goal was intended to remedy "decades" of "race discrimination in government highway contracting [and] barriers to the formation of minority-owned construction businesses." *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 970 (8th Cir.2003).

Pursuant to these congressional directives, the United States Department of Transportation ("DOT") has issued regulations, found in Part 26 of Title 49 of the Code of Federal Regulations, that are intended to help achieve that goal. One such regulation requires recipients of federal highway funds to "set an overall goal for DBE [subcontractor] participation in ... DOT-assisted contracts." 49 C.F.R. § 26.45(a)(1). Such a contract goal may *not* be a rigid quota. 49 C.F.R. § 26.43(a). Instead, the recipient must ensure that the primary (main) contractor awarded a DOT-assisted contract has either (1) met the goal for DBE subcontractor participation or (2) if unsuccessful in doing so, has made a good-faith effort to achieve it. 49 C.F.R. § 26.53(a). Determining wheth-

---

1. Once completed, the bridge will replace the 80–year–old Stillwater lift bridge, a "chokepoint" that clogs traffic when raised for boats to pass. http://minnesota.publicradio.org/display/web/2012/02/29/primer-stillwater-bridge (last visited May 5, 2013). The bridge's anticipated total cost will be between $580 million and $676 million. http://www.dot.state.mn.us/stcroixcrossing/ (last visited May 5, 2013). The project was approved in 2012 after "more than a decade of bitter politics and litigation." http://minnesota.publicradio.org/display/web/2012/02/29/primer-stillwater-bridge (last visited May 5, 2013).

2. A disadvantaged business enterprise or DBE is a "for-profit small business concern [t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged" or "[w]hose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5. Persons in certain minority groups, including "women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, [and] Subcontinent Asian Americans," are presumed to be socially and economically disadvantaged. 49 C.F.R. § 26.67(a)(1).

3. The following constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 65.

er a contractor has made a good-faith effort turns on several factors listed by the DOT in an Appendix to the regulations entitled "Guidance Concerning Good Faith Efforts." 49 C.F.R. pt. 26 app. A. The inquiry is a flexible one, based on (among other things) the means used by the contractor to obtain DBE participation, the scope of its negotiations with DBE subcontractors, and whether it undertook efforts to divide subcontracted work into smaller units (if feasible) to facilitate participation. 49 C.F.R. pt. 26 app. A § IV. A contracting authority *must* consider these factors when assessing good-faith efforts. 49 C.F.R. pt. 26 app. A § II ("In any situation in which you have established a contract goal, part 26 *requires you* to use the good faith efforts mechanism of this part.") (emphasis added).

## II. McCrossan and the Project here

The Project here involves, *inter alia,* grading, surfacing, and other road work to build the "approach to the new St. Croix River Crossing," including the construction of a new interchange at the intersection of Minnesota Highways 36 and 95 in Oak Park Heights. (Eastburn Aff. Ex. 1 § 1.2.) The Project is partially federally funded (*id.* § 1.1) and, hence, subject to the legal requirements set forth above. MNDOT set a goal for the Project at 16.7% participation by DBE subcontractors. (*Id.* § 1.8.)

McCrossan is a highway contractor that "routinely performs work on large projects for the State of Minnesota and its political subdivisions." (McCrossan Aff. ¶ 2.) In late 2012, it responded to MNDOT's "request for qualifications," asking contractors to advise MNDOT of their interest in participating in the Project. (*Id.* ¶ 5.) From those responses, MNDOT would then compile a "shortlist" of contractors that would be asked to submit proposals to undertake the Project, from which the winning contractor would be selected. (Eastburn Aff. Ex. 1 § 1.3.) Three contractors ultimately made the "shortlist": McCrossan, Ames/Lunda, and a joint venture between Hoffman Construction Company and Shafer Contracting Company ("Hoffman/Shafer"). (*Id.* Ex. 2.)

All three contractors then submitted proposals for the design and construction of the approach, per requirements contained in a MNDOT document entitled "Instructions to Proposers" (the "Instructions"). (*Id.* Ex. 1.) Several provisions of the Instructions have critical importance here. First, the Instructions provided that proposals would be evaluated, among other things, on whether they "meet the requirements of the DBE federal regulations at 49 C.F.R. Part 26." (*Id.* § 5.3.2; *accord id.* § 4.4.4 (incorporating DBE and good-faith-effort standards from 49 C.F.R. Part 26).) Second, they provided that a contractor's DBE commitments and good-faith efforts had to be established and documented at the time the contractor's proposal was submitted to MNDOT. (*Id.* §§ 4.4.1.2–.7.)[4] Third, they provided that a contractor asserting that "any aspect of the procurement process . . . is contrary to legal requirements" was required to file a protest with MNDOT "as soon as the basis for the protest is known," but in no event later than 10 days before the proposal was due. (*Id.* § 3.10.1.) "The failure of a [con-

---

4. Such information was to include a list of the DBE subcontractors that had been solicited by the primary contractor to participate in the Project, the expected cost of each subcontractor's participation, and the type of work to be performed. For example, McCrossan indicated in its proposal that it had committed to accept DBE subcontractor bids for, among other things, rebar installation (approximately $116,000), surveying (approximately $650,000), and erosion supplies (approximately $113,000). (Eastburn Aff. Ex. 5 at 2.)

tractor] to raise a ground for a protest ... within the applicable period shall constitute an unconditional waiver of the ... protest ... and shall preclude consideration of that ground." (*Id.*) Finally, the Instructions provided that any contractor submitting a proposal agreed to be bound by all of the Instructions' terms. (*Id.* § 3.10.)

The Instructions also spelled-out the process by which MNDOT would select the winning proposal. Each was to be given a "technical score"—a number between zero and 100—based on its conformity with the Project's specifications and the ability to address potential areas of concern, such as mitigation of environmental hazards and maintenance of traffic flow during construction. (*Id.* §§ 4.2.4, 5.3.) Each proposal's overall cost would then be divided by its "technical score" to calculate an "adjusted score," the lowest of which would represent the "best value" among the proposals. (*Id.* § 5.5.) "Unless all Proposals [we]re rejected or MNDOT otherwise elect[ed] not to award the [c]ontract," the Instructions provided that MNDOT would select "the responsive and responsible [contractor] with the lowest adjusted score." (*Id.*)

McCrossan's proposal received the highest technical score and had the lowest overall cost by more than $5 million. (*Id.* Ex. 3.) Accordingly, it had (by far) the best overall "adjusted score." However, its proposal indicated that it had secured only 10.69% participation by DBE subcontractors, well below the 16.7% goal.[5] Although McCrossan "certified" that it had made

good-faith efforts to meet the goal and would continue to do so for the duration of the Project, MNDOT disagreed and rejected the proposal as "non-responsive," in accordance with the Instructions. (*Id.* Ex. 5; Trebesch Aff. Ex. A, ¶ 9.) In a 12–page letter dated March 11, 2013, it offered several reasons why it had reached that conclusion, including that McCrossan (1) had failed to provide adequate documentation showing it had used "all reasonable and available means" to solicit DBE participation, (2) had not attempted to "break out" subcontractor work into smaller, "economically feasible units to facilitate DBE participation," and (3) had not explained why it rejected certain DBE subcontractor quotes or shown that it had negotiated in good faith with the subcontractors to lower their proposed costs. It also noted that Ames/Lunda and Hoffman/Shafer had submitted proposals with 16.7% DBE subcontractor participation. (Eastburn Aff. Ex. 5.) These reasons track those listed (among others) in the "Guidance Concerning Good–Faith Efforts" contained in Appendix A to Part 26 of the regulations.

Having rejected McCrossan's proposal, MNDOT selected the contractor with the next best adjusted score, Ames/Lunda, to complete the Project.

### III. McCrossan objects

McCrossan challenged MNDOT's decision and asked it to reconsider. (*Id.* Ex. 6.) It argued, among other things, that MNDOT had acted "contrary to federal regulations" because "the DBE program

---

5. There is some dispute precisely what percentage of DBE participation McCrossan actually secured. Although its proposal indicated 10.69%, that figure was calculated based on the use of a DBE subcontractor (Shaw Trucking) whose intended work was listed as "to be determined." (*See* Eastburn Aff. Ex. 5 at 2.) Hence, MNDOT excluded all sums McCrossan claimed it would spend with Shaw and, accordingly, calculated McCrossan's actual DBE participation at 6.57%. (*Id.* at 3.) Regardless of whether McCrossan's actual DBE participation was 6.57% or 10.69%, each falls well below the Project's goal of 16.7%.

require[s] a different goal setting method and a good faith efforts analysis for design-build projects," such as the Project here, than "design-bid-build project[s]." (*Id.* at 4.) [6] McCrossan contended that design-build projects proceed "with much less certainty and greater risk" because the design is incomplete at the time the proposal is submitted to the contracting authority (MNDOT). Such uncertainty, it argued, "directly affected [its] ability to hire DBE subcontractors" (*id.* at 5) and, hence, it asserted that MNDOT should have evaluated its efforts utilizing different standards than those provided in Appendix A to Part 26.

A three-member panel—a MNDOT district engineer, MNDOT's director of employee and corporate services, and an attorney serving as MNDOT's director of contract management—held a reconsideration hearing on March 19, 2013, at which McCrossan was represented by counsel. (*Id.*) Shortly thereafter, the panel issued a comprehensive, 11–page decision denying relief and concluding that McCrossan had "not demonstrated adequate good faith efforts to recruit DBE commitment." (*Id.* at 11.) The panel expressly rejected, as having "no support . . . in the federal regulations," McCrossan's argument that different standards should apply to design-build projects than design-bid-build projects, and it pointed out that in any event, McCrossan had "failed to provide any spe-

cific evidence or examples of how the design-build process affected [its] ability to subcontract with [ ] DBEs." (*Id.*) The panel also agreed with the earlier determination that McCrossan had not shown good-faith efforts to recruit DBE subcontractors, based on the factors set forth in Appendix A to Part 26. (*Id.* at 6–10.)

McCrossan then filed a "protest," arguing that the panel's decision was "rife with errors and arbitrary and capricious conclusions and reasoning." (*Id.* Ex. 7 at 13.) The "protest official" designated in the Instructions rejected it. That determination was adopted by Charles Zelle, MNDOT's Commissioner, in a final decision dated April 12, 2013. (*Id.* Ex. 8.)

On April 17, 2013, McCrossan filed a Petition for a writ of *certiorari* with the Minnesota Court of Appeals, seeking further review of MNDOT's decision. (*Id.* Ex. 10.) [7] In its Petition, McCrossan asserted, *inter alia,* that (1) MNDOT's decision was arbitrary and capricious and violated federal law because it misapplied the DOT's regulations regarding DBEs and (2) MNDOT violated McCrossan's equal-protection rights under the Fourteenth Amendment to the United States Constitution. (*Id.*) The Court of Appeals issued a writ of *certiorari* to MNDOT on April 17, 2013 (*id.* Ex. 11), but has not yet ruled on the Petition. [8]

---

6. "Unlike traditional design-bid-build procurements, in which contractors bid on fully-developed plans and specifications prepared by the owner, design-build procurements require contractors to propose on a broadly defined . . . concept that the contractor will both design and build." (Compl. ¶ 7.) According to McCrossan, this makes it difficult for a contractor to "estimate with final assurance the anticipated amount of work that can be procured from subcontractors and suppliers." (*Id.* ¶ 9.)

7. Most Minnesota state agency decisions are reviewable by the Minnesota Court of Appeals via *certiorari*. *See* Minn. Stat. § 480A.06, subd. 3; Minn. R. Civ. App. P. 115.01.

8. McCrossan apparently has not sought a stay from the Court of Appeals, perhaps due to the fact that it once claimed a stay was already in place—in an April 12, 2013 letter to Commissioner Zelle, McCrossan asserted that it "believes that a stay . . . has in fact already been granted," based on earlier (but unstated) representations by MNDOT. (Eastburn Aff. Ex.

## IV. McCrossan files suit and seeks injunctive relief

McCrossan commenced the instant action against MNDOT and Commissioner Zelle on April 22, 2013.[9] Tracking the assertions in its Petition for *certiorari*, McCrossan alleges in its Complaint that MNDOT violated federal law (including the Fourteenth Amendment) when rejecting its proposal and awarding the contract to Ames/Lunda. It seeks, among other things, (1) a declaration that the contract is void and (2) injunctive relief enjoining performance of the contract and requiring the Project to be "re-bid." It now moves for a temporary restraining order or preliminary injunction enjoining performance on the contract until its claims have been decided. (Doc. No. 6.) By Stipulation, Ames/Lunda intervened in the case as a Defendant on April 25, 2013, both it and MNDOT filed responses to McCrossan's Motion on April 30, 2013, and McCrossan has filed a reply. The Motion is now ripe for disposition.

## STANDARD OF DECISION

The Supreme Court recently emphasized that injunctive relief "is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). This Court must consider four factors to determine whether relief is warranted here: (1) McCrossan's likelihood of success on the merits; (2) the threat of irreparable harm in the absence of injunctive relief; (3) the balance between that harm and the harm injunctive relief would cause Defendants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*).[10] The Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). The "complete burden" of establishing that the *Dataphase* factors weigh in favor of relief lies with McCrossan. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987); *accord, e.g., Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## ANALYSIS

McCrossan's Motion will be denied because it has failed to demonstrate either irreparable harm absent injunctive relief or that it is likely to succeed on the merits.

## I. Irreparable harm

 The Court begins it analysis with irreparable harm, as "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Bandag, Inc. v. Jack's*

---

9.) Yet, if a stay were already in place, there would be no need for injunctive relief here.

9. For ease of reference, the Court hereafter refers to MNDOT and Commissioner Zelle jointly as "MNDOT."

10. *Dataphase* was a preliminary-injunction case. Here, McCrossan seeks a temporary restraining order (TRO) *or* a preliminary injunction, which differ in two key ways: unlike a preliminary injunction, a TRO (1) typically is issued without notice to the adverse party and (2) expires automatically after 14 days,

unless the Court orders otherwise. *See* Fed. R.Civ.P. 65(a)-(b); *Branstad v. Glickman*, 118 F.Supp.2d 925, 935–37 (N.D.Iowa 2000). As notice has been provided to all parties here, and because the issues have been fully briefed, the Court elects to treat McCrossan's Motion as seeking a preliminary injunction. Regardless, the standard for issuing a TRO or a preliminary injunction is the same. *See, e.g., S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708–09 (8th Cir.1989).

*Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir.1999) *(per curiam )* (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). Indeed, although likelihood of success is an important consideration, "[e]ven when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." *Roudachevski v. All–Am. Care Ctrs., Inc.,* 648 F.3d 701, 706 (8th Cir. 2011); *accord, e.g., Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 n. 5 (8th Cir.2008) *(en Banc )* ("[I]n some cases, lack of irreparable injury is the factor that should begin and end the ... analysis."); *Watkins,* 346 F.3d at 844 (lack of irreparable harm is "an independently sufficient ground upon which to deny" an injunction).

■ While the Court appreciates its brevity, McCrossan's one-paragraph argument on irreparable harm is unavailing. It asserts that it

> easily satisfies [the irreparable harm] inquiry because this Court has repeatedly found that the loss of the chance to participate in a fair bidding process raises a significant threat of irreparable injury to the plaintiff. Irreparable harm is not contingent on McCrossan showing that MNDOT would award it the contract if the DBE requirements were properly applied, the harm is derived from the very existence of the impropriety itself.

(Pl. Mem. at 7 (internal quotation marks omitted).) In support, it cites *United Technologies Communications Co. v. Washington County Board,* 624 F.Supp. 185, 188 (D.Minn.1985) (Rosenbaum, J.), which held that an unfair bidding process for public contracts automatically "raises a significant threat of irreparable injury," for which the "only true remedy" is injunctive relief.[11]

In the undersigned's view, however, it is not enough for a plaintiff simply to point to a "tainted" bidding process and claim irreparable harm. *United Technologies* cited no authority for this "unique" proposition, which several federal courts have questioned. *See Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.,* 868 F.2d 1085, 1088 (9th Cir.1989); *Advanced Seal Tech., Inc. v. Perry,* 873 F.Supp. 1144, 1149–50 (N.D.Ill.1995); *see also Lametti & Sons, Inc. v. City of Davenport, Iowa,* 432 F.Supp. 713, 715 (S.D.Iowa 1977) (noting that "the integrity of the competitive bidding system [can] be adequately protected by a damage action"). Several Minnesota cases, too, have rejected the notion that a party automatically suffers irreparable injury by losing "its chance to participate in an untainted [bidding] process." *Dakota Barge Servs., Inc. v. St. Paul Port Auth.,* No. C3–96–1853, 1997 WL 10882, at *3 (Minn.Ct.App. Jan. 14, 1997); *accord, e.g., Queen City Constr., Inc. v. City of Rochester,* 604 N.W.2d 368, 372–73 (Minn.Ct.App.1999) (disagreeing that "the loss of the meaningful opportunity to bid on [a] contract is sufficient hardship to justify an injunction"); *Am. Iron & Supply Co. v. Cnty. of Hennepin,* No. C0–96–2278, 1997 WL 396226, at *2 (Minn.Ct.App. July 15, 1997) ("[L]ost opportunity does not present an irreparable harm in this context.") (internal quotation marks omitted).

At least two sound reasons support this conclusion. First, as stated in *Superior Services, Inc. v. Dalton,* 851 F.Supp. 381, 387 (S.D.Cal.1994), while "certain courts

---

**11.** McCrossan also cites *Mathiowetz Construction Co. v. Minnesota Department of Transportation,* 137 F.Supp.2d 1144, 1149–50 (D.Minn.2001) (Frank, J.), but that case merely adopted the reasoning in *United Technologies.*

have concluded that injury to a right to a valid procurement process constitutes irreparable injury," if that were always the case, "an unsuccessful bidder could ... easily obtain a TRO by filing a protest," which would "substantially interfere with the provision of government services." *Accord, e.g., San Diego Beverage & Kup v. United States,* 997 F.Supp. 1343, 1347 (S.D.Cal.1998). This Court does not believe that public contracting should be so easily compromised.

Second, under the logic espoused in *United Technologies,* "*every* bid protest would involve an irreparable injury." *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (emphasis added); *accord San Diego Beverage,* 997 F.Supp. at 1347. That is simply not the law. In *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 392–93, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the Supreme Court overturned a long line of cases granting injunctions as a matter of course upon a showing of patent infringement—that is, based on a *presumption* (rather than a *showing*) of irreparable harm due to the nature of the claim itself. Although eBay was a patent case, its holding has been extended to other types of actions. *See, e.g., Salinger v. Colting,* 607 F.3d 68, 77 (2d Cir.2010) (copyright infringement); *Byrd v. Aaron's, Inc.,* C.A. No. 11–101, 2011 WL 2672009, at *8 & n. 6 (W.D.Pa. June 16, 2011) (Wiretap Act), *adopted,* 2011 WL 2672204 (W.D.Pa. July 8, 2011). Notably, *eBay* rejected the application of categorical rules in injunction cases and instructed lower courts to consider "traditional equitable principles" when deciding whether to grant relief. 547 U.S. at 391–94, 126 S.Ct. 1837; *see*

*also WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275, 285 (2d Cir.2012) ("[C]ourts may no longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of the case, the failure to issue an injunction would actually cause irreparable harm."). The Court perceives no obvious reason why *eBay* should not extend to this case—the Court need not, and should not, presume irreparable harm to McCrossan simply because it may have been involved in a "flawed" MNDOT bidding process.

Because McCrossan has offered no other irreparable-harm argument, the Court's analysis could end here. *See Gelco Corp.,* 811 F.2d at 420. But even if the Court were to consider "traditional equitable principles," it would still find irreparable harm lacking.

■ As in *OAO Corp.,* McCrossan's (purported) losses here are "primarily monetary": it has missed out on a contract that was awarded to a different contractor. 49 Fed.Cl. at 480. Yet, it has long been held that losses compensable in money damages are not irreparable. *E.g., Watkins,* 346 F.3d at 846; *Gelco,* 811 F.2d at 420; *Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573, 582 (2003) (finding no irreparable harm where it was "clear that most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract"). Perhaps more importantly, it is not clear that missing out on the contract actually damaged McCrossan at all—that it would have profited on the contract is unsupported in the record and inherently conjectural.[12] Fur-

---

12. Although an unsuccessful bidder "is entitled to recover the costs incurred in preparing the unsuccessful bid ... and its expenses, ... [l]oss of profit shall not be considered an expense item." *Tel. Assocs., Inc. v. St. Louis Cnty. Bd.,* 364 N.W.2d 378, 383 (Minn.1985) (emphasis added). Regardless, "the inability to recover lost profits on a contract that was improvidently awarded to another *does not equate to irreparable harm." Duininck Bros., Inc. v. State,* No. C3–97–972, 1997 WL 729233, at *4 (Minn.Ct.App. Nov. 25, 1997)

thermore, there is no guarantee McCrossan would have received the contract even in a "fair" bidding process, because as noted above MNDOT retained the right to reject all of the proposals it received. *Lametti & Sons*, 432 F.Supp. at 715 (finding no irreparable harm because "[a] mere bidder acquires no legally enforceable contract right; the [contracting authority] could have rejected all of the bids"); *see also OAO Corp. v. United States*, 17 Cl.Ct. 91, 105 (1989).

In addition, the issue at this juncture is not whether McCrossan *has been* irreparably harmed, but rather whether *"the injunctive relief sought* is necessary to *prevent* irreparable harm." *Taxpayers' Choice Volunteer Comm. v. Roseau Cnty. Bd. of Comm'rs*, 903 F.Supp. 1301, 1308 (D.Minn.1995) (Kyle, J.) (emphases in original). It is not. If McCrossan were to prevail on its claims, the Ames/Lunda contract would be declared void. *See, e.g., Rochon Corp. v. City of St. Paul*, 814 N.W.2d 365, 369 (Minn.Ct.App.2012). Assuming the Project were not yet complete at that time—and the Court perceives no reason why this action cannot be resolved before the Project's expected completion date, which is nearly two years away[13]—the bidding process would begin anew, with McCrossan having the chance to participate. No injunction appears necessary, therefore, to protect McCrossan's "rights"

in a "fair" bidding process. *See Am. Iron*, 1997 WL 396226, at *2 (affirming denial of preliminary injunction because, "[i]f [the plaintiff were] successful, it *will* have the opportunity to compete in a fair bidding process") (emphasis in original).

Lastly, the Court finds it noteworthy that McCrossan could have sought from the Minnesota Court of Appeals the same injunctive relief it seeks here. Indeed, it filed its action in that court *before* commencing the instant action, yet it opted not to seek any preliminary relief there. This belies its argument that irreparable harm is imminent.

## II. Likelihood of success

■ Though McCrossan's failure to establish irreparable harm suffices to deny relief, the Court will also address its likelihood of success—or, more accurately, the lack thereof.

In order to demonstrate a likelihood of success, McCrossan must show that it has a "fair chance of prevailing" on its claims. *Planned Parenthood*, 530 F.3d at 732. The question is not whether it has "prove[d] a greater than fifty percent likelihood" that it will succeed, *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir.2007), but rather whether any of its claims provide a "fair ground for litiga-

---

(emphasis added); *see also Cincinnati Elecs. Corp. v. Kleppe*, 509 F.2d 1080, 1089 (6th Cir.1975) ("The only recognized loss which Cincinnati or any other unsuccessful bidder sustains is the cost of preparation of bids or proposals. These costs may be recovered in an action [against the contracting authority]. Thus there is an adequate remedy available, and this is [an adequate] reason for denying an injunction.") (internal citations omitted); *Lee Constr. Co. v. Fed. Reserve Bank of Richmond*, 558 F.Supp. 165, 187 n. 33 (D.Md. 1982).

13. Despite its contentions to the contrary, McCrossan's Reply makes clear that the issues raised here are primarily legal. (Reply Mem. at 7 (asserting that "MNDOT's 'judgment' was infected by errors of law"); *accord id.* at 3 ("[The] core arguments advanced in this case [are] that MNDOT violated federal regulations set forth in 49 C.F.R. Part 26, and that MNDOT violated McCrossan's constitutional rights by applying the design-bid-build DBE framework to a design-build project.").) The Court perceives no reason why these issues require significant (if any) factual development that would delay resolution of the merits.

tion," *Watkins*, 346 F.3d at 844. For several reasons, the Court does not believe McCrossan's claims provide a fair ground for litigation here.[14]

*First*, McCrossan appears to have waived its claims. Its contentions center on MNDOT's "error" in using the guidance contained in 49 C.F.R. Part 26, in particular Appendix A to that Part, which it believes was inapplicable to the Project. It asserts that MNDOT "ignored the fact that this was a design-build project" rather than a "design-bid-build project," and it claims that the DBE goals and good-faith efforts requirements in Part 26 cannot be applied to design-build projects. (Pl. Mem. at 10–14.) And it believes that the regulations "are not designed for application *at the time of proposal* in the design-build context," at which point it is (purportedly) "impossible" to comply with the DBE requirements. (*Id.* at 12 (emphasis added).)[15]

---

**14.** Although not addressed by the parties, the Court harbors some doubt whether either of McCrossan's claims is actionable. Count I of the Complaint asserts that MNDOT transgressed "the rules in 49 C.F.R. Part 26" (Compl. ¶ 27), but federal regulations generally may be enforced by private parties only where a *statute* creates a private cause of action. *Lewis v. Phoenix Am. Adm'rs, Inc.*, Civ. No. 10–2582, 2011 WL 221308, at *1 (D.Minn. Jan. 21, 2011) (Kyle, J.) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.") (quoting *Alexander v. Sandoval*, 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). Here, McCrossan has not pointed to any "statutory text" creating a private right of action for violations of Part 26—the Complaint simply cites the regulations themselves. (Although Count I cites the Declaratory Judgment Act, that statute does not create an independent cause of action. *E.g., Anderson v. Sullivan*, 959 F.2d 690, 692 n. 4 (8th Cir.1992).) In addition, the regulations specify that "[a]ny person who believes that a recipient [of federal highway funds] has failed to comply with its obligations under this part may file a written complaint with" the Federal Highway Administration, 49 C.F.R. § 26.103, and if a violation is found, the recipient "may be subject to formal enforcement action *by the [Administration]*," 49 C.F.R. § 26.101 (emphasis added). These provisions strongly suggest that no private cause of action exists for violations of Part 26. *See, e.g., Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, No. IP 94–1175, 1998 WL 1988826, at *22–29 (S.D.Ind. May 13, 1998); *Gauvin v. Trombatore*, 682 F.Supp. 1067, 1072 (N.D.Cal.1988). Furthermore, both claims in the Complaint are asserted against MNDOT, a state agency, and may be barred by the Eleventh Amendment. *See Sherbrooke Turf*, 345 F.3d at 967 n. 1; *see also H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 240 (4th Cir. 2010). McCrossan has attempted to avoid this by also suing Commissioner Zelle, and the Eleventh Amendment does not preclude claims for prospective injunctive relief against state officials. *Kentucky v. Graham*, 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (court must satisfy itself that "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"). Where "a complaint is based entirely upon past acts and does not allege continuing conduct that, if stopped, would provide a remedy to [the] plaintiff," it cannot escape the Eleventh Amendment. *KM Enters., Inc. v. McDonald*, No. 11–cv–5098, 2012 WL 4472010, at *7 (E.D.N.Y. Sept. 25, 2012). That appears to be true here: "[T]he majority of [McCrossan's] contentions—in fact, the entire impetus underlying the present action—concern the previous award of the [contract] to [Ames/Lunda] rather than [McCrossan].... Assuming that these allegations state a claim for relief, they nevertheless plainly state a past, not a continuing, violation of federal law." *Id.*

**15.** Notably, Ames employees have opined that MNDOT's use of the DBE procedures here was "not unusual." (*See* Ames Aff. ¶ 4 ("The DBE requirements and procedures on this Project are not unusual and have been experienced by us on many prior projects—both design/build and design/bid/build."); Fahland Aff. ¶ 4 ("It is not unusual for Ames to be involved in design-build and design-bid-build projects with stated DBE goals.").) *See also*

■ But McCrossan was (or should have been) aware from the outset that MNDOT intended to use Part 26 to evaluate its proposal *when submitted*—as discussed in more detail above, that fact was disclosed, in several places, in the Instructions to "shortlisted" contractors long before proposals were tendered to MNDOT.[16] The Instructions further provided that a contractor asserting that "*any* aspect of the procurement process ... is contrary to legal requirements" was required to bring that issue to MNDOT's attention in *advance* of submitting its proposal. (Eastburn Aff. Ex. A § 3.10.1 (emphasis added).) "The failure ... to raise a ground for a protest ... within the applicable period shall constitute an *unconditional waiver of the ... protest ...* and shall preclude consideration of that ground." (*Id.* (emphasis added).) Because McCrossan did not timely object to MNDOT's use of the Part 26 regulations (which include Appendix A), this argument is waived.[17]

*Second,* McCrossan's argument finds no support in challenged regulations themselves. Indeed, the opposite is true: the regulations clearly required MN DOT to

establish a DBE participation goal for the Project, *see* 49 C.F.R. § 26.45(a)(1) ("[Y]ou must set an overall goal for DBE participation in your DOT-assisted contracts."), and Appendix A to Part 26 expressly provides that "[i]n *any* situation in which [a recipient of federal highway funds has] established a contract goal, part 26 *requires [it] to use the good faith efforts mechanism of this part,*" 49 C.F.R. pt. 26 app. A § II (emphases added). In other words, the regulations facially apply to all projects, whether design-bid-build or design-build; nothing indicates that they cannot or should not apply to design-build projects, as McCrossan contends.

McCrossan points to 49 C.F.R. § 26.53(e) to support its argument. (Pl. Mem. at 11.) True, that regulation provides "[i]n a 'design-build' ... contracting situation, a recipient [of federal funds] may establish a goal for the project. The master contractor then establishes contract goals, as appropriate for the subcontracts it [awards]." But a close reading of the regulation reveals that it does not preclude recipients of federal funds from utilizing the "standard" methods to determine DBE participation or good-faith efforts. In-

---

*Hillside Drilling, Inc. v. City of Berkeley,* No. C 99–4646, 2002 WL 413371, at *4 n. 10 (N.D.Cal. Mar. 12, 2002) (rejecting argument that contracting authority should not have included DBE requirements in contract terms where, as here, the plaintiff claimed "compliance is a 'virtual impossibility' ").

**16.** McCrossan disputes this in its Reply, asserting that it was not informed "MNDOT [would] apply the factors in Appendix A of 49 C.F.R. Part 26" when evaluating its proposal. (Reply Mem. at 8–9.) Quite the contrary: the Instructions clearly and expressly provided that "[p]roposals will be evaluated based on the following ... criteria: (f) [whether] [p]roposer information, certifications, and documents ... are included in the Proposal and are complete, accurate, and responsive, *and they meet the requirements of the DBE federal*

*regulations at 49 C.F.R. Part 26.*" (Eastburn Aff. Ex. 1 § 5.3.2 (emphasis added).)

**17.** As MNDOT notes in its brief, a sound policy rationale undergirds the rule requiring timely challenges to bidding procedures: "It would be inefficient and costly to [permit a challenge to a previously known problem] after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. [Contractors] cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive [an] award and then, if unsuccessful, claim the solicitation was infirm." *Allied Materials & Equip. Co. v. United States,* 81 Fed.Cl. 448, 458 (2008) (quoting *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1314 (Fed.Cir.2007)).

deed, even McCrossan notes in its brief that the process described in § 26.53(e) is merely a "suggestion." (Pl. Mem. at 18.) This is precisely why the DOT's official commentary to § 26.53(e) specifies that "[o]n design-build contracts, the normal process for setting contract goals *does not fit the contract award process well* .... In these situations, the recipient *may* alter the normal process." (Eastburn Aff. Ex. 13 at 2 (emphases added).) The administrative panel noted this fact when it denied McCrossan's request for reconsideration. (*Id.* Ex. 6 at 5 (pointing out that § 26.53(e) "simply says a recipient *may* alter the normal process") (emphasis in original) (internal quotation marks omitted).) The undersigned agrees with that conclusion.

Perhaps most damning to McCrossan's argument, however, is the fact that both Ames/Lunda and Hoffman/Shafer *were able to submit proposals meeting MNDOT's 16.7% goal for DBE participation.* If MNDOT had erred in applying the Part 26 regulations at the time of proposal because, as a design-build project, McCrossan could not "state definitively what the 'work of the contract' is that DBEs and non-DBEs will [ ] perform[ ]" (Pl. Mem. at 12), then it should have been equally "impossible" for the remaining contractors to hit MNDOT's target at that time. The fact that they did so is telling. Equally telling is the fact that McCrossan had no difficulty "solicit[ing] and obtain[ing] detailed bids" from DBE subcontractors, as indicated by its "preparation and submittal of a proposal for the Project calculated to the exact dollar: $52,326,236.00." (Ames/Lunda Mem. at 2.) And this makes eminent sense. McCrossan's bid encompassed both the *design* and *construction* of the approach—who better than McCrossan would know precisely what subcontracting was necessary to complete its very own proposal?

*Third,* McCrossan's remaining contentions are unconvincing. It argues, for example, that MNDOT impermissibly imposed a *de facto* 16.7% quota, asserting that a MNDOT official, Andrea Robinson, informed it the 16.7% goal "need[ed] to be met" in order for it to be awarded the contract. (Pl. Mem. at 14; McCrossan Aff. ¶ 7.) But even if this statement had in fact been made (which Robinson denies), documents in the record seriously undermine McCrossan's argument. It appears quite clear that MNDOT did not reject the proposal because McCrossan failed to meet the DBE goal, but rather because it failed to make (and document) *good-faith efforts to achieve* that goal. (*See* Eastburn Aff. Ex. 5 at 6–11; *id.* Ex. 6 at 2–11.) Indeed, McCrossan asserted this same "quota" argument at the reconsideration hearing and the panel rejected it, because the record established that MNDOT had disavowed McCrossan's proposal due to its "fail[ure] to make adequate good faith efforts." (*Id.* Ex. 6 at 6.) That conclusion finds ample support in the documents before the Court.

McCrossan also argues that even if applicable to the Project, MNDOT misinterpreted the factors in Appendix A to Part 26 when evaluating the extent of its good-faith efforts. MNDOT determined, for instance, that McCrossan had not engaged in good-faith efforts because it rejected several DBE subcontractors solely based on price, without negotiating for more competitive bids.[18] This was error, according to McCrossan, because "forcing prime contractors to negotiate with subcontractors before submitting their proposals will inev-

---

**18.** "The fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a [contrac- tor's] failure to meet the contract DBE goal, as long as such costs are reasonable." 49 C.F.R. pt. 26 app. A § IV(D)(2).

itably lead to the unethical behavior of 'bid shopping' ... or 'bid chopping.'" (Pl. Mem. at 16.)[19] Yet, as the reconsideration panel noted, a "prime contractor can enter into negotiations with a DBE [subcontractor] in good faith without divulging the solicited bids or the prices." (Eastburn Aff. Ex. 6 at 8.) The Court agrees that neither bid shopping nor bid chopping is preordained by the procedures MNDOT used here.

McCrossan next argues that requiring negotiation with subcontractors before submitting a design-build proposal "ignores the practical realities of bidding," because subcontractors "have the incentive to submit their bids very close to the deadline," making it difficult for prime contractors to negotiate before their submissions are due. (Pl. Mem. at 15.) Of course, neither Ames/Lunda nor Hoffman/Shafer appear to have encountered such difficulty. And nothing in the record suggests that a prime contractor cannot require subcontractors to submit bids far enough in advance to leave time for negotiation before the prime contractor's proposal is to be submitted.

Finally, McCrossan argues that application of Part 26's good-faith-efforts factors was not narrowly tailored to meet a compelling government interest and, hence, violated its Fourteenth Amendment rights. (Pl. Mem. at 17–18.) But as noted above, the regulations expressly provide that MN DOT was *required* to set a DBE goal for the Project and was *required* to use "the good faith efforts mechanism" in Part 26's Appendix. In doing so, MNDOT was simply complying with the mandates of federal law, which have previously withstood strict scrutiny review. *See Sherbrooke Turf,* 345 F.3d at 972 ("[W]e conclude that the DOT regulations, on their face, satisfy the Supreme Court's narrow tailoring requirements."); *see also H.B. Rowe Co. v. Tippett,* 615 F.3d 233, 236 n. 1 (4th Cir. 2010) ("Federal courts of appeal have uniformly upheld the federal DBE program against equal-protection challenges.").

In any event, the Court struggles to comprehend how McCrossan's equal-protection rights were violated when all three "shortlisted" contractors were subjected to the same DBE and good-faith efforts requirements in the regulations. There is no allegation that use of the Part 26 factors adversely impacted DBE participation in the Project or the contractors bidding to obtain it. Nor has McCrossan offered any evidence to show that the factors made it more difficult to obtain DBE subcontractors. (*See* Eastburn Aff. Ex. 6 at 5 ("[McCrossan] failed to provide any specific evidence or examples of how the design-build process affected [its] ability to subcontract with the DBEs.").) All three contractors were operating on a level playing field, and two met the Project's goal while McCrossan *did not;* there is simply *no* suggestion in the record that MNDOT's actions benefitted one contractor over another.[20]

## III. Other considerations and abstention

The remaining *Dataphase* factors—namely, (1) the balance between the harm

---

**19.** "Bid shopping" occurs when a prime contractor forwards a subcontractor's bid to others in an attempt to obtain a lower price, while "big chopping" occurs when a prime contractor tells a subcontractor that it must decrease its bid by a certain amount to obtain the work. (McCrossan Aff. ¶¶ 17–18.) Both are unethical under standards set by the American Society of Professional Estimators. (*Id.* ¶ 16.)

**20.** If anything, McCrossan's failure to comply with the DBE requirements likely *benefitted* it, by enabling it to submit a lower-priced overall proposal. (*See* Ames Aff. ¶ 5 ("The decision to meet the 16.7% DBE goal on this Project increased Ames/Lunda's proposal price.").)

McCrossan would suffer absent injunctive relief and the harm such relief would cause Defendants, and (2) the public interest— also do not weigh in McCrossan's favor.

As already discussed, the Court perceives little harm in denying relief to McCrossan, but granting relief would potentially subject MNDOT to significant financial penalties pursuant to the terms of its contract with Ames/Lunda. (Chiglo Aff. ¶¶ 4–8.) Any such penalties would be borne by the Minnesota fisc and, hence, the state's residents (taxpayers). Further, delay occasioned by injunctive relief could result in cancellation of the contract, requiring the entire process to begin anew. (*Id.* ¶¶ 7–8.) And, quite obviously, an injunction would only further postpone construction of the bridge over the St. Croix River, badly needed infrastructure that took more than a decade of wrangling before finally receiving federal approval and funding. While the Court recognizes the public's interest in a fair bidding process, the equities here do not tip in favor of relief.

Furthermore, the undersigned is loath to interfere in government contracting and procurement. As noted previously by this Court's most well-known jurist, "given the complexity of procurement decisions, the lack of expertise possessed by the courts, . . . and the potential confusion, inefficiency, delay, and increased expense that can result," courts should hesitate to get in the middle of public-contract disputes. *Onan Corp. v. United States*, 476 F.Supp. 428, 432 (D.Minn.1979) (Devitt, C.J.); *accord, e.g., Smith & Wesson, Div. of Bangor Punta Corp. v. United States*, 782 F.2d 1074, 1081–82 (1st Cir.1986) (noting the "strong public interest in an orderly, efficient, expeditious government procurement process"; "It would be intolerable for any frustrated bidder to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign.") (internal quotation marks and citation omitted).

Moreover, the Court's reluctance to inject itself into the middle of this dispute raises another issue: abstention. MNDOT argues, and Ames/Lunda "suggests," that the Court should abstain from hearing this matter in light of the pending action before the Minnesota Court of Appeals. (MNDOT Mem. at 6–8; Ames/Lunda Mem. at 21–22.) Each points to *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), where the Supreme Court held that a federal district court may abstain from exercising jurisdiction over a federal case in favor of concurrent and parallel state proceedings, if doing so would serve the interests of "wise judicial administration, giving regard to the conservation of judicial resources." McCrossan contends that *Colorado River* abstention is inappropriate because this action and the action before the Minnesota Court of Appeals are not "parallel," a prerequisite to the application of *Colorado River*, as the scope of the proceeding here exceeds that in state court.

■■ But in the Court's view, it makes no difference whether the two proceedings are parallel, because abstention is justified under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). There, the Supreme Court held that a federal court may abstain over an action where the pendency of a similar action in state court implicates concerns of federal-state comity. *Id.* at 44–45, 91 S.Ct. 746. Abstention under *Younger* is appropriate where (1) there is an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) the state proceeding affords an adequate opportunity to raise the federal questions presented. *Cedar Rapids Cellular Tel., L.P. v. Miller,*

280 F.3d 874, 879 (8th Cir.2002); *see also Sprint Commc'ns Co. v. Jacobs*, 690 F.3d 864, 867 (8th Cir.2012), *cert. granted,* —— U.S. ——, 133 S.Ct. 1805, 185 L.Ed.2d 810 (2013) (No. 12–815).

Here, there can be no dispute that the first factor (an ongoing state judicial proceeding) has been met.[21] Nor can there be any dispute that the third factor (adequate opportunity to raise federal claims) also has been met, given that McCrossan asserted in the its Petition the same federal "violations" it asserts in this case. Even if the scope of the proceedings somehow differs, as McCrossan argues, there can be no dispute that they overlap to a substantial degree. Certainly, if the Court of Appeals were to find that MNDOT had violated McCrossan's constitutional rights, that determination would significantly impact the proceedings here. And there is no reason to conclude that the Court of Appeals cannot adjudicate McCrossan's federal claims when deciding its Petition. *See In re Cent. Specialties, Inc.*, No. A12–0024, 2012 WL 3641295, at *2–8 (Minn.Ct.App. Aug. 27, 2012) (addressing alleged violations of Part 26 and deprivation of equal protection in *certiorari* review of MNDOT decision that a "construction-project bid failed to meet federal regulatory requirements for participation by disadvantaged business enterprises"). Finally, it seems beyond peradventure that important state interests (the second *Younger* factor) have been implicated by McCrossan's Petition, which challenges MNDOT's bidding and contracting procedures. Indeed, this is likely precisely why the Minnesota legislature has created a mechanism for aggrieved parties to seek judicial review (through *certiorari* ) of Minnesota agency decisions.

 At bottom, "interests of comity and federalism support federal abstention" where, as here, "state judicial review of the [state agency's] order has not yet been completed." *Sprint Commc'ns*, 690 F.3d at 867 (affirming *Younger* abstention over action challenging decision by Iowa Utilities Board, as plaintiff had also filed petition for review in Iowa state court asserting that the decision violated federal law). Accordingly, the Court will abstain from hearing this action under *Younger*.[22]

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that McCrossan's Motion for Temporary Restraining Order or Preliminary Injunction (Doc. No. 6) is **DENIED.** It is further **ORDERED** that this action is **STAYED** pending resolution of McCrossan's Petition by the Minnesota Court of Appeals.

**21.** Two days after MNDOT and Ames files their Memoranda in response to the instant Motion, raising the specter of abstention for the first time, McCrossan moved the Minnesota Court of Appeals to stay its Petition pending the outcome of the case *sub judice*. (Reply Mem. at 3.) Putting aside that this appears to be an attempt to manipulate the forum, the Court of Appeals has not yet ruled and, hence, the state action remains pending. Even if it had ruled, however, the analysis would not change. *See Sprint Commc'ns*, 690 F.3d at 867 ("[O]nce a party initiates state 'judicial' proceedings in which the state has an impor-

tant interest, the party must follow the proceedings through to the end."); *Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1144 (8th Cir.1990) ("[C]ourts have consistently held that a party cannot avoid *Younger* by choosing not to pursue available state appellate remedies.").

**22.** When a district court abstains from hearing a case, the better course is to stay the action rather than dismiss it. *See Sprint Commc'ns*, 690 F.3d at 869.